**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GROOT INDUSTRIES, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 4907 |
| v. | ) ) | |
| ROBERT CORDELL, an individual, and ROBIN CORDELL, an individual, | ) ) ) | HONORABLE DAVID H. COAR |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Groot Industries has filed suit for conversion, alleging that Robert Cordell, a former employee, pocketed approximately $500,000 from cash transactions and cooked the company's books in an effort to cover his tracks. Groot also contends that Robin Cordell (Robert's wife) is jointly and severally liable as a cosignatory on the bank account into which the converted funds were deposited. Groot is a Delaware corporation with its principal place of business within Cook County, Illinois, and the Cordells are citizens of the State of Florida. The court therefore has diversity jurisdiction over this state-law suit. *See* 28 U.S.C. § 1332(a). Groot has moved for summary judgment on both liability and damages, seeking compensatory and punitive damages; recovery of all compensation paid to Robert Cordell, on account of his breach of fiduciary duty; establishment of a constructive trust over the Cordells' assets; pre-judgment interest; and costs. For the reasons set forth below, Groot's motion is GRANTED in part and DENIED in part.

# FACTS[1]

## *Groot's Operations*

Groot Industries is in the waste-disposal business. It maintains its primary corporate office in Elk Grove Village, Illinois and employs approximately 650 people. (R.77 ¶¶1-2.) Groot operates various "transfer stations" where customers can dispose of garbage and recyclable materials; one such station, commonly known as the "1759 Transfer Station," or "1759," is located at 1759 Elmhust Road, in Elk Grove Village, Illinois. (R.41 ¶9.) While Groot has many contract customers who frequently use 1759 and are billed on a monthly or other regular basis, the station (like Groot's other transfer stations) is also open to the public for waste disposal on a fee-for-use basis; payment may be made in cash or by check. (R.41 ¶¶11,12; R.71, ¶17; R.43, Tab C ¶10.)

Groot's computerized accounting system is known as the "solid waste accounting system." It tracks the weight and variety of each customer's waste; after a truck is "weighed in" and "weighed out" (i.e., before and after it dumps its waste), the system automatically generates invoices or "tickets" used for billing purposes based on the weight differential. (R.41 ¶10; R.73, Ex.3 at18:17-22.) All four of Groot's transfer stations, as well as Groot's corporate headquarters, are networked through this accounting system. (R.77 ¶¶4-6.)

For cash transactions, known as "10C ticket transactions," customers are charged and cash is collected on the basis of the information contained on a "10C ticket;" the customer's name in a 10C ticket transaction is recorded in the solid waste accounting system as "Misc."

---

[1] Both parties repeatedly fail to comply with Fed. R. Civ. P. 56 and Local Rule 56. Groot's statement of facts is replete with conclusions; the Cordells' response is replete with argument. Garrity's affidavit contains conclusory opinions; statements outside his personal knowledge; and references to documents, in particular sales journals, that Groot failed to tender with his affidavit. *See* Fed. R. Civ. P. 56(e)(1). Groot's purported designation of Garrity as an expert in the calculation of the company's damages will not cure these defects. The court has stricken the many noncompliant paragraphs in the parties' Local Rule 56 statements and in the affidavits. The facts set forth here represent the remainder of the parties' relevant submissions.

(R.41 ¶14; R.43, Tab C ¶9.)  Cash payments are collected by the scale operators and placed in a safe to which all of the scale operators have access.  (R.73, Ex.3 at 22:19-23:3.)

### *Robert Cordell's Employment at Groot*

As the Facility Manager or Operations Manager (both titles frequently appear in the record) at 1759 from July 21, 1997 until his voluntary retirement on May 29, 2008, Robert Cordell[2] was responsible for oversight of all the facility's operations and reported to Larry Groot. (R.41 ¶8; R.73, Ex.3 at 17:13-15.)  Specifically, he was responsible for determining the daily balance of cash and checks received, and physically taking the cash and receipts to Groot's corporate offices on a daily basis.  (R.41, ¶¶17-18.)  Sometimes, he would delegate responsibility for balancing the daily accounts to the scale operators, and when he was not at work, another employee would have to take the cash to the corporate office.  (R.71 ¶¶17-18; R.73, Ex.3 at 27:15-28:3.)  Cordell had access to the solid waste accounting system and had the ability to "zero out" previously entered 10C ticket transactions (R.41 ¶20) but also alleges that at least thirty Groot employees had the knowledge and access to do this (R.73, Ex.4 ¶5).  He was not responsible for collecting cash payments from customers.  (R.73, Ex.3 at 22:19-23:3.)

### *Missing Funds From Cash Transactions*

In June 2008, John Garrity (Groot's CFO) ordered an investigation into 10C ticket transactions at 1759 after Paul Wilson (Cordell's successor as Operations Manager) told him that some number of these transactions appeared to have been "zeroed out" in the preceding months.  (R.41 ¶¶41-43; R.43, Tab C ¶¶22-24.)  When a transaction is zeroed out, the price charged to the customer is changed to zero in the accounting system, so that the record of the transaction specifies a weight but no price and thus the transaction does not appear as paid.  (R.43, Tab C

---

[2] Henceforth, references to 'Cordell' are always to be understood as referring to Robert Cordell.  To avoid ambiguity or confusion, the court will refer to the defendants by their first and last names whenever Robin Cordell is also relevant to the events being described or to the court's analysis.

¶14; R.73, Ex.2 at 25:12-21.)  Garrity further testified that Groot would not ordinarily become aware of zeroed-out transactions without specifically looking for records of them in the accounting system.  (R.43, Tab C ¶16.)

Garrity asked Groot's controller and staff accountants to perform an audit of the records stored in the solid waste accounting system in order to uncover all zeroed-out 10C ticket transactions at 1759 from January 1, 1998 through May 29, 2008.  (R.41 ¶33; R.43, Tab C ¶25; R.73, Ex.2 at 24:22-25:15.)  Garrity prepared a Proof of Loss Form from the report, which listed all such transactions and a calculation of their cash value based on the data recorded in the accounting system.  (R.41 ¶47; R.43, Tab D; R.43, Tab C ¶34; R.73, Ex.2 at 23:16-23.)  The report, submitted as Exhibit A to Garrity's affidavit, yielded the following annual totals:

| YEAR | CASH VALUE | YEAR | CASH VALUE |
|---|---|---|---|
| 1998 | $870.90 | 2003 | $29,948.84 |
| 1999 | $1,408 | 2004 | $86,983.20 |
| 2000 | $995 | 2005 | $85,201.72 |
| 2001 | $325.50 | 2006 | $117,457.20 |
| 2002 | $805.50 | 2007 | $145,270.50 |
|  |  | 2008 | $36,608.85 (figure through May 29) |
| **TOTAL** | **$4,409.90** | **TOTAL** | **$502,470.31** |

(R.43, Tab D.)  The report shows that from July 2003 through the end of May 2008, 10C ticket transactions at 1759 were zeroed out on an almost daily basis.  (R.43, Tab D at Groot 0962-Groot 1044.)  Groot did not receive any cash for these transactions.  (R.41 ¶50; R.43, Tab C ¶37.)

The error rate of the solid waste accounting system is unknown and the accuracy of the system is not certified.  (R.77 ¶¶9-10.)  The system cannot determine which computer is used to alter a 10C ticket.  (*Id.* ¶8.)  Cordell also stated in his affidavit that "[t]here are numerous legitimate business reasons for 'zeroing out' 10C ticket transactions."  (R.73, Ex.4 ¶6.)

### *Cordell's Alleged Admissions of Theft*

Garrity testified in his affidavit that Cordell admitted, on at least three occasions, that he stole cash from Groot.[3]  (R.41 ¶24.)

*First*, Garrity testified that he spoke with Cordell on the phone on June 18, 2008; during that conversation, he told Cordell that he believed Cordell had stolen cash from Groot.  At first, Cordell responded, "I don't know," but later in the conversation admitted, "I may have taken some cash."  Garrity asked Cordell "How much?" and Cordell responded, "I don't know.  Why don't you tell me how much?"  Garrity responded, "It looks like $5,000 per month," and asked Cordell whether anyone else was involved.  Cordell said that there was not.  (R.41 ¶¶43-45; R.43, Tab C ¶¶29-32.)

*Second*, Garrity testified that on June 20, 2008, he and Cordell again spoke on the phone.  Garrity advised Cordell that he believed the amount Cordell had stolen was over $500,000; Cordell responded that he believed he had only taken "around $200,000" and that he wanted to pay Groot back no matter how long it took.  Cordell also agreed to meet with Garrity and other Groot officers on June 23, 2008. (R.41 ¶¶55-56; R.43, Tab C ¶¶41-42.)

*Third*, Garrity testified that on June 23, 2008, Garrity, Lee Brandsma (one of the owners of Groot) and Jose Castillon (Groot's Human Resource Manager) met with Cordell at a McDonalds in Elk Grove Village.  Garrity said, "We want our money back."  When Brandsma asked, "Did you have an accomplice?," Cordell replied "I had no accomplice.  I took it all myself."  Brandsma then asked, "How did you do it?  Who else was involved?," and Cordell replied, "I changed the cash tickets, kept the cash and no one else was involved."  (R.41 ¶¶57-58; R.43, Tab C ¶¶43-44; R.73, Ex.3 at 69:16-25.)  The record does not contain any testimony from

---

[3] Contrary to Cordell's repeated objection that these alleged statements are inadmissible hearsay, they are admissible as admissions of a party opponent pursuant to Federal Rule of Evidence 801(d)(2).

Brandsma or from Castillon.

At Cordell's deposition, Counsel for Groot questioned him about the admissions he allegedly made during the McDonald's meeting and the phone calls with Garrity. In response, Cordell repeatedly asserted his Fifth Amendment privilege against self-incrimination. (R.73, Ex.3 at 70:1-20.) He also asserted the privilege when asked whether he zeroed out any 10C ticket transactions. (*Id.* at 68:9-15.)

### *Robert and Robin Cordell's Finances*

Throughout the time period in question, Robert and Robin Cordell shared two joint checking accounts at TCF Bank; from at least as early as 2004, the Cordells had their payroll checks (including Robert's checks from Groot) automatically deposited into checking account ######1295. (R.41 ¶¶62-63.) The Cordells's bank records for account ######1295 reveal the following differentials between their payroll deposits and their total deposits for the period of 2004-May 2008:

| YEAR | PAYROLL DEPOSITS | TOTAL DEPOSITS | DIFFERENTIAL |
| --- | --- | --- | --- |
| 2004 | $91,139.24 | $170,280.98 | $79,141,74 |
| 2005 | $113,455,69 | $142,581.63 | $29,125.94 |
| 2006 | $104,131.30 | $127,187.69 | $23,056.39 |
| 2007 | $111,144.38 | $182,787.04 | $71,642.66 |
| 2008 | $66,928.49 | $93,779.59 | $26,851.10 |
| **TOTAL** | **$486,799.10** | **$716,616.93** | **$229,817.83** |

(R.41 ¶¶67-71; R.43, Tab I at 1-2 (summarizing data from Tab H).) During the period of July 1, 2003 through the end of his employment in 2008, Groot paid Robert a total of $381,571.21 in compensation. (R.41 ¶76; R.43, Tab C ¶49; R.43, Tab E.)

Robert testified that while he was employed by Groot, he had no other means of earning money. (R.73, Ex.3 at 36:3-6.) Robin testified that her employment at various insurance companies was her only means of earning money during that period other than the $45/week in

- 6 -

child support she received from her ex-husband. (R.73, Ex.6 at 16:2-17:13.) Robert further testified that his mother gifted them a total of $10,000--$20,000 in checks during that period (R.73, Ex.3 at 43:6-7) and that he "sold a few things," including a boat, although he was "not sure which boat" and did not say for how much. (*Id.* at 66:22-67:2.) The Cordells currently reside in Homosassa, Florida, in a house they purchased in February 2007, but they still own a home at 1137 Boxwood Court in Crystal Lake, Illinois; Robin's stepson, Greg Vandermey, pays them $1,500 month rent to live there. (*Id.* at 47:17-20.) Robin also testified that the couple received checks from Robert's mother, sold a boat, and currently collect monthly rent from Greg Vandermey for the Crystal lake property. (R.73, Ex.6 at 28:7-9, 38:20-39:1.)

## SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in his pleadings or conclusory statements in affidavits; he must support his contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation

and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## ANALYSIS

### *Robert Cordell's Liability*

"The essence of an action for conversion is the wrongful deprivation of property from the person entitled to possession." *In re Thebus*, 108 Ill.2d 255, 259 (Ill. 1985) (citations omitted). To prove conversion[4], Groot must establish by a preponderance of the evidence that (1) it has a right to the property; (2) it has an absolute and unconditional right to the immediate possession of the property; (3) it has made a demand for possession; and (4) the Cordells wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 184 Ill.2d 109, 114 (Ill. 1998). An action for conversion may be maintained where the converted property is money if "the converted funds are capable of being described, identified, or segregated in a specific manner." *Bill Marek's the Competitive Edge, Inc. v. Mickelson Group, Inc.*, 346 Ill. App. 3d 996, 1003 (Ill. App. Ct. 2004). In contrast, "an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money," *Thebus*, 108 Ill. 2d at 259, or to enforce a right to an "indeterminate sum." *Bill Marek's*, 346 Ill. App. 3d at 1003. Illinois has abandoned the old rule that funds must be "specifically earmarked," that is, not "comingled" with other funds, in order to sustain an action for conversion. *Id.*

Groot seeks recovery of specifically identifiable funds: the cash paid by customers in zeroed-out 10C ticket transactions at 1759. This is not a general debt that Cordell owes to Groot but specific payments to the company that he converted to his own property. And Groot seeks a

---

[4] Groot also alleges that the Cordells committed theft in violation of 720 ILCS 5/16-1(a)(4), but it cites no provision of Illinois law that provides for any private right of action under this criminal statute. The court disregards all arguments and citations that bear only on this allegation, as well as Groot's occasional, conclusory remarks that the Cordells committed fraud.

determinate sum, calculated from the company's automated accounting records, which have been authenticated by the company's CFO. Thus, an action for conversion of funds is available here. Moreover, there is no question about requirements (1) or (2), and Groot made a demand for possession when Cordell met with Garrity, Brandsma, and Castillon at McDonalds on June 23, 2008. (R.73, Ex.3 at 69:16-25.) The only real question is (4): whether it is more likely than not that Robert Cordell is the one who stole the money from the cash transactions at 1759.

To begin with, Cordell does not deny, in any sworn testimony submitted at summary judgment, that he zeroed out 10C ticket transactions; that he stole cash from Groot; or that he told Garrity, Brandsma, and Castillon that he had done these things. His affidavit denies nothing; rather, he repeatedly cites ¶¶18,19, 22 of his answer to the complaint—but he may not rest on the pleadings at summary judgment. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322-23; *Albiero*, 246 F.3d at 932. At his deposition, he invoked his privilege against self-incrimination when asked whether he zeroed out any 10C ticket transaction or admitted to Garrity, Brandsma, and Castillon that he stole money. (R.73, Ex.3 at 68:9-15, 70:1-20.) While an allegation in a complaint may not be deemed admitted based merely on a party's invocation of the privilege during discovery, a district court may draw an adverse inference at summary judgment against a party who has invoked the privilege and remained silent in the face of incriminating evidence. *See LaSalle Bank Lake View v. Seguban*, 54. F.3d 387, 390-92 (7th Cir. 1995). In other words, Cordell's silence is a relevant fact that must be "weighed in light of other evidence rather than leading directly and without more to the conclusion of guilt or liability." *Id.* at 391. The rest of the evidence is telling, albeit circumstantial.

There is no evidence in the record to show that anyone other than Robert Cordell could have taken the money from the cash transactions at 1759. Cordell was responsible for balancing

the cash against the receipts and for delivering the cash and hard-copy receipts to Groot's corporate office on a daily basis. (R.41 ¶¶17-18.) While he may have delegated these tasks from time to time, it is clear that they were his to perform on a day-to-day basis, and he maintains that he did. (R.71 ¶¶17-18; R.73, Ex.3 at 27:15-28:3.) Although he alleges in his affidavit that at least thirty Groot employees had enough knowledge and access to the solid waste accounting system to zero out transactions, he cannot name even one such individual. (R.73, Ex.4 ¶5.) An unsubstantiated and self-serving affidavit will not suffice at summary judgment.

More importantly, it is not enough that some employee or other—perhaps one at another transfer station or at Groot's corporate office, as Cordell speculates in his brief—could have zeroed out 10C ticket transactions. That employee would also need access to the cash from 1759; zeroing out transactions, without removing the cash contemporaneously, would create a daily cash surplus that Cordell would have found, but Cordell has not testified that he ever found a cash surplus. And again, Cordell cannot name a single individual at 1759—or, for that matter, at the corporate office—who had both access to the cash and sufficient knowledge of the accounting system; nor has he provided even the slightest indication of any conspiracy. Yet he would ask a jury to conclude that day after day, over the course of five years, some employee (or employees) accessed the accounting system, zeroed out transactions, and contemporaneously removed the precise amount of cash and hard-copy receipts so that Cordell could balance the books every day without ever finding a discrepancy or suspecting anything. Of course, Groot ultimately bears the burden of proof, and Cordell need not explain exactly how half a million dollars went missing. But he cannot avoid summary judgment if he provides *no* evidence to rebut the conclusion that he did precisely what he will not deny doing, what he will not deny admitting to, and what is otherwise difficult to explain.

Instead of evidence, Cordell advances a series of unsubstantiated speculations and bare possibilities. He suggests, for instance, that Groot's corporate office might have received all the cash that was due for the zeroed-out transactions, but he has done nothing to impugn Groot's business records that say otherwise; nor, again, has he testified that he ever found more daily cash at 1759 than the accounting system indicated he should have. Next he suggests that the disputed transactions might have been zeroed out for various "legitimate" or "authorized" business purposes (R.73, Ex.4 ¶6) but he cannot explain what even one such purpose would be, or who might have given authorization, or why there was such an enormous spike in these purposes beginning in 2003. Lastly, Cordell tries computer error. He argues that Groot failed to "exercise[] any checks and balances" to correct for the solid waste accounting system's rate of error, and he tries to make heavy weather out of the fact that the rate of error, if any, has never been determined and that the accuracy of the system has not been "certified." (R.77 ¶¶9-10.) The significance of these points is at best unclear, since Cordell provides no reason to think that Groot's accounting system is at all unreliable, much less that it is defective enough to cause errors with the relentless frequency he postulates.

Robert and Robin Cordell's unexplained finances are also very telling. For the years 2004-2008, their checking-account deposits exceeded their wages by $229,817.83 (R.41 ¶¶67-71; R.43, Tab I at 1-2 (summarizing data from Tab H)) yet they patently fail to explain where this 47% excess came from. Robert Cordell testified that his mother gifted them between $10,000 and $20,000. (R.43, Tab C ¶16; R.73, Ex.3 at 43:6-7.) They currently receive $1,500 monthly rent payments on their house in Crystal Lake, but there is no evidence that they started renting their house before they moved to Florida in 2008. (R.73, Ex.3 at 47:17-20.) The rest of the shortfall would have to be covered by their sale of a boat, but they were "not sure which

boat" they sold and had no idea how much they got for it. (*Id.* at 66:22-67:2.) No reasonable juror could find a quarter million dollars in these explanations. When pressed to explain the deposits at his deposition, Robert Cordell repeatedly said "I don't know, without sitting it down and figuring it out. I don't know." (*Id.* at 67:8-9.) The time to do sit down and figure it out has by now come and gone.

Summary judgment, as the Seventh Circuit has repeatedly said, is the "put up or shut up moment in a lawsuit." *See Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009) (citations omitted). Cordell has not put up anything—not even a sworn denial—that tends to counter the allegations or explain away the circumstantial evidence against him. Groot is therefore entitled to summary judgment on the question of his liability for conversion.

### *Robin Cordell's Liability*

Groot also contends that Robin Cordell is jointly and severally liable for the converted funds because she is a cosignatory of the Cordells' TCF checking account, into which she deposited the stolen cash that she received from her husband. (R.43, Tab H.) Robin Cordell's only response to this argument is to deny "any knowledge that Robert converted any funds of Groot," and to deny that she "knew anything as to the operations of Groot or Robert's duties at Groot." (R.72, Opp'n at 5; R.73, Ex.6 ¶¶3-11.) This response misses the mark.

With respect to liability for conversion, the question is not whether Robin Cordell knew of her husband's activities but whether she "wrongfully . . . assumed control, dominion, or ownership over [Groot's] property." *See Cirrincione*, 184 Ill.2d at 114; *Jensen v. Chicago & W. Ind. R.R.,* 94 Ill. App. 3d 915, 932 (Ill. App. Ct. 1981) ("The essence of conversion is not acquisition by the wrongdoer but a wrongful deprivation of the owner thereof."); *see generally*, 1-8 ILLINOIS TORT LAW § 8.01[2] ("this so-called intentional tort resembles more accurately a

strict liability tort"). Liability for conversion does not even require that a defendant use the wrongfully held property to his or her own advantage. *See Fortech, L.L.C. v. R.W. Dunteman Co.*, 366 Ill. App. 3d 804, 809-813 (Ill. App. Ct. 2006) (following *Schwartz v. Schwartz*, 82 Misc. 2d 51 (N.Y. Sup. Ct. 1975)). In *Schwartz*, a mother and daughter opened a joint bank account; when the mother fell ill several years later and was ready to enter a nursing home, she asked her son to close the account and use the proceeds to pay for her care. *Id.* at 52. The son did as his mother asked, without his sister's knowledge, and his sister prevailed in a suit for conversion of her half of the joint bank account. *Id.* at 53-54. Most importantly for present purposes, as the Illinois Court of Appeals noted, "his wife was also named as a defendant and suffered the same fate, since her name was on the account used to pay the nursing home's bills." *Fortech*, 366 Ill. App. 3d at 812; *see also Schwartz*, 82 Misc. 2d at 53. Although this aspect of *Schwartz* was cited in dictum in *Fortech*, the law in Illinois seems perfectly clear that a defendant who is in possession or control of another's wrongfully converted property—for instance, by being a cosignatory on the account in which it is held—is liable for conversion. Such is the case for Robin Cordell.

### *Damages*

Although the Cordells try to attack the accuracy of the solid waste accounting system and Garrity's ability to accurately calculate Groot's damages from its accounting records,[5] they do not succeed in raising any triable issues as to whether Groot has calculated its compensatory damages "to a reasonable degree of certainty." *See, e.g.*, *Dowd & Dowd, Ltd. v. Gleason*, 352

---

[5] The Cordells mount these arguments in the course of their objections to qualifying Garrity as an "expert" in the solid waste accounting system. The court does not see why this qualification would be necessary in the first place. As CFO of Groot, Garrity can authenticate Exhibit A to his affidavit (R.43, Tab D) as a business record documenting zeroed-out 10C ticket transactions at 1759 without expert-witness status. Garrity testified that that document was produced under his direction and control. (R.43, Tab C ¶34.) Beyond that, the court fully agrees that Garrity may not testify to facts outside of his personal knowledge or draw conclusions as to Cordell's liability, and the court has accordingly stricken all such assertions and conclusory opinions from Garrity's affidavit.

Ill. App. 3d 365, 384 (Ill. App. Ct. 2004). They argue, for instance, that Garrity has "no special IT training" and has never written or designed computer software; that Garrity does not know how to zero out a 10C ticket transaction; that this is the first time Garrity has ever calculated company loss from an alleged theft; that the solid waste accounting system is "proprietary," is not "certified," and does not come with an instruction manual; and so forth. (R.72, Opp'n at 3; R.73, Ex.2 at 19-34.) None of the Cordells' arguments impugn the accuracy of Groot's automated accounting records or show that Garrity, as Groot's CFO, cannot authenticate and interpret those records. Groot is therefore entitled to compensatory damages in the amount of $502,470.31, its total loss from zeroed-out 10C ticket transactions for the period of 2003-May 2008, as reflected in the automated records from the solid waste accounting system.

Groot also seeks to recover all of the salary it paid to Cordell while he was converting company property. In Illinois, "[a]n employer may recover an employee's total compensation paid during the time period that an employee was breaching fiduciary duties owed the employer." *Veco v. Babcock*, 243 Ill. App. 3d 153, 165 (Ill. App. Ct. 1993); *see also Vendo Co. v. Stoner*, 58 Ill.2d 289, 314 (Ill. 1974). A fiduciary relationship exists "where there is a special confidence reposed on one side and a resulting superior knowledge and influence on the other," *A.T. Kearney, Inc. v. INCA Int'l, Inc.*, 132 Ill. App. 3d 655, 661 (Ill. App. Ct. 1985), and "exists as a matter of law between principal and agent." *Id.* Cordell was entrusted with oversight responsibility for all operations at 1759 and, in particular, with responsibility for the station's cash: it was his duty to balance the daily cash and receipts, and to deliver them to the corporate office. It is hard to imagine a clearer breach of fiduciary duty than stealing the very cash he was responsible for. Groot is therefore entitled to recover Cordell's compensation for the period of time during which he zeroed out 10C ticket transactions and removed the corresponding cash on

an almost daily basis. Groot's records clearly reveal that time period to be July 2003 through May 2008 (R.43, Tab D) during which Groot paid Cordell a total of $381,571.21. (R.41 ¶76; R.43, Tab C ¶49; R.43, Tab E.)

Groot also requests pre-judgment interest on both its compensatory damages and its recovery of Cordell's compensation. An award of pre-judgment interest is a matter within the district court's discretion. *Dallis v. Don Cunningham & Assoc.*, 11 F.3d 713, 718 (7th Cir. 1993); *Bank of Chicago v. Park Nat'l Bank*, 266 Ill. App. 3d 890, 900 (Ill. App. Ct. 1994). Pursuant to the Illinois Interest Act, 815 ILCS 205/2, interest may be awarded "if the amount due is a fixed amount or is easily computed." *Bank of Chicago*, 266 Ill. App. 3d at 900. Since pre-judgment interest is intended to be "a form of compensation," *see Michaels v. Michaels*, 767 F.2d 1185, 1204 (7th Cir. 1985), the court awards interest on Groot's compensatory damages only. A demand for the return of converted property is an essential element of the tort, so interest accrues from the date of the demand. *La Parr v. City of Rockford*, 100 F.2d 564, 569 (7th Cir. 1938), *cert. denied*, 307 U.S. 624 (1939). Thus, interest on the $502,470.31 in converted funds accrues from June 23, 2008, at the statutory rate of five percent per annum. *See* 815 ILCS 205/2.

Next, Groot requests punitive damages. As an initial matter, Groot's request for "at least $4,000,000"—roughly eight times its compensatory damages—is unreasonable. Moreover, the Illinois Supreme Court has repeatedly said that punitive damages are disfavored and are to be awarded very cautiously. *See, e.g.*, *Deal v. Byford*, 127 Ill. 2d 192, 203 (Ill. 1989). Punitive damages require that torts "are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 186 (Ill. 1978);

*see also Bell Leasing Brokerage, LLC v. Roger Auto Service, Inc.*, 372 Ill. App. 3d 461, 474 (Ill. App. Ct. 2007) (punitive damages available in conversion suit where defendant "acts willfully or with such gross negligence to indicate a wanton disregard of the rights of others"). Deceit alone is insufficient. *Id.*

Although Cordell's breach of his fiduciary duty to Groot suggests that an award of punitive damages might be warranted, *see, e.g.*, *Union Oil Co. of California v. Walters*, 1996 U.S. Dist. LEXIS 8313, at *6-7 (N.D. Il., June 14, 1996) (double damages at summary judgment against employee entrusted with disbursing company funds who submitted sham receipts and pocketed $285,535 of company money for services that were never rendered), Groot has not shown that Cordell acted with anything like actual malice, deliberate violence, or wanton disregard. Furthermore, the court finds that Groot's recovery of Cordell's full compensation on account of his breach of fiduciary duty is sufficient to further the twofold purpose of punitive-damage awards. *See, e.g.*, *Kelsay*, 74 Ill.2d at 188 (punitive damages aim at punishment and deterrence). This remedy is tantamount to an award of punitive damages—it is not compensation owed to Groot, as if Cordell completely failed to perform his job duties and did nothing in exchange for his salary. On a compensatory theory, this remedy would substantially *over*compensate Groot; its point, however, is clearly to punish Cordell for his breach of trust and to deter others in his position from similar breaches. Since the purposes of punitive damages have already been served, a further award (against which the Cordells would almost certainly be judgment proof anyway) is unwarranted. Accordingly, Groot's request is denied.

Next, Groot requests the "imposition of a constructive trust on all of the Defendants' property." A constructive trust is an equitable remedy that may be imposed to redress the acquisition of property by wrongful means, including breach of a fiduciary duty. *Suttles v.*

*Vogel*, 126 Ill.2d 186, 193-94 (Ill. 1988) (citations omitted); *see also Graham v. Mimms*, 111 Ill. App. 3d 751, 762 (Ill. App. Ct. 1982) ("courts have been 'inveterate and uncompromising' in applying the constructive trust remedy to fiduciaries who have misappropriated corporate property"). Thus, Illinois law provides for the imposition of a constructive trust in the amount of Groot's compensatory damages, i.e., the converted funds, but Groot cites no authority that supports the imposition of a constructive trust over the amount of Cordell's compensation, which is not "wrongfully acquired property." *See Suttles*, 126 Ill.2d at 193. Nor will the court issue a blanket order indiscriminately imposing a constructive trust on all of the Cordells' property. A constructive trust, with Groot as beneficiary, is therefore to be established in the amount of $502,470.31, plus interest.

Lastly, Groot asks the Cordells to bear its litigation costs. As the court previously noted, the submissions at summary judgment from both parties—including Groot—left an awful lot to be desired from the perspective of Fed. R. Civ. Pro. 56 and Local Rule 56. *See supra* note 1. Accordingly, Groot's request for costs is denied. Each side shall bear its own costs.

## CONCLUSION

For the foregoing reasons, Groot's motion for summary judgment is GRANTED in part and DENIED in part. The court enters judgment in favor of Plaintiff Groot Industries and against Defendants Robert and Robin Cordell, providing the following relief: (1) compensatory damages against Robert and Robin Cordell, jointly and severally, in the amount of $502,470.31, plus pre-judgment interest of 5% accruing from June 23, 2008; (2) a constructive trust in the foregoing amount to be established for the benefit of Groot; (3) further damages against Robert Cordell, individually, in the amount of $381,571.21. All other requests for relief are denied.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: November 17, 2009**